Our fourth case for this morning is Tanya Cihlar v. Acting Commissioner Berryhill. I believe this is now the fourth time I have been before this court on a question of whether an administrative law judge adequately explained where he came up with a hypothetical question when addressing mental limitations. Tanya Beth Cihlar, at the time of the alleged onset of disability, was a younger individual for Social Security purposes. Ms. Cihlar had back problems which reduced her ability to perform physically demanding work above the light exertional category. That was the finding the ALJ made, we are not in dispute of that. But given her age, if only light exertional limitations applied, she would be found not disabled. Ms. Cihlar also had learning difficulties and generalized anxiety disorder. So the ALJ describes a hypothetical person with, he puts it as limited education, limits her to routine, no constant decision making, workplace changes, no production or pace rate work, etc. He builds in a limited ability to function. I thought your biggest argument was that you didn't know what pace rate work meant. Mr. Berryhill Correct. That is the biggest part. There is a problem with it in the fact that you did not identify or explain what that was and what it meant. Ms. Cihlar In the context of the full hearing, though, isn't it relatively clear that it refers to the fact that if, I mean, I'm sorry, I can't get out of my head the Lucy and Ethel scene in I Love Lucy, where the conveyor belt's going by and they're working quickly. But it sounds like that's the kind of thing she can't do, because it's too fast. You can't be required to do X number of actions per hour. But these jobs that the vocational expert identifies, price marker, router, labeler, do seem to be jobs that can be paced by the individual. Mr. Berryhill You still have production requirements and you still have to meet within a certain level. Ms. Cihlar But is it your position that she needs three Ms. Cihlar Well, the job she had basically done up to that point, she had done maintenance work, which again, no one cares about how you go about doing it or where you do it, as long as the ultimate issue is done. The other job she did was landscaping type work. Again, the same situation. Whereas in the case of Lucy, and I've used that example repeatedly, there they've sped up the line. But let's say that for various reasons, there's three or four different types of chocolates that are supposed to go into a different box. If you have difficulty cognitively understanding at times where one chocolate, a dark chocolate comes across the conveyor line, and you have to pause and think, now you're completely far behind and you have a problem. I've noted that the judge didn't define what he meant by this case in the second hearing, but he did define it in the first hearing. And I'm just trying to find my note on that. He indicated at that time that it involved actual pace. Well, was he referring to an assembly line? Was he referring to something where other people depended on her? Correct. Head and behind? Because that, of course, is different than what he was describing as far as maintenance and landscaping and other things, where the start and finish of the job is all you do. Other people depending on it down the line, you've got to work at their pace or everybody loses. Yes, that is exactly the point I was making. But I'm not sure that distinction was clear, that she couldn't do other things very capably. Even though you're not on an assembly line, I'm not sure everybody's old enough to know what Lucy did, but it is funny when, you know, here it comes and it's piling up and you're fumbling. It is funny, but I mean, it's not funny here. But she was capable of doing certain things and not disabled. It's just that she couldn't get in the assembly line. Well, that's not exactly the case because the judge, or the LJ in this particular case specifically adopted the findings of Dr. Sedgwick, or Sedgig, and Dr. Sedgig indicated that she was going to continually have problems with maintaining work pace. So there's going to be a problem. She needed to basically, the difference is, is it's not whether she could do fast paced production or assembly line production. It's whether she needed to work in a position that she could work at her own pace, which is different. It's a very subtle difference. So more of piecework kind of work, so that once you've accomplished task X, you get paid for it, but maybe you don't get paid as much because it takes you longer to do task X. Correct. And let me indicate, I don't know what the outcome is going to be on this, if the question is phrased correctly. Well, the hypothetical that was given to the vocational expert included, the work should be routine, no consistent decision making, or workplace changes, no production or pace work, rate work, and no constant interaction with others. Doesn't that accurately describe her problem? Except that she had problems when it came to working within a work pace. That's the difference. It said, workplace changes and no production or pace rate work. Again, it's pace rate work, which means work, and again, it's the point of what the judge defined that as at the time of the first hearing on record page 144. That is, piecework goes where you have got to have fast and frequent with your coworkers depending on keeping a pace so they can keep going well. That was his statement at the first hearing. So it's a very subtle difference between these. But in this case, where it is an individual with her problems, it is a significant problem. So are you arguing that the jobs of price marker, router, and labeler are inconsistent with this RFP? I can't answer that, Your Honor, simply because the hypothetical question provided- It's just not defined enough, you think? No, that's the simple question, is that whether or not this was properly defined and whether it's clear so that the vocational expert is clearly oriented to all of her limitations. And that's where this arises. I know this is a hair splitting point, but it can be. But in this particular case, it becomes a significant point with this particular claimant. Okay. All right. Thank you. Ms. Hahn. May it please the Court. Lou Hahn on behalf of the Commissioner of Social Security. So, Ms. Hahn, let me just start you where I was ending up. The residual functional capacity description has this critical phrase, no pace rate work. A, it's undefined, and B, if it really is intended to capture the kind of thing Judge Mannion was talking about, the landscaping work or the, you know, something that I'm sure took you to do the thing, then you get paid for it, and maybe you get paid less if you don't do as many that day, but you can still do it. But anyway, no pace rate work. And then we see the ALJ identifying price marker, router, or labeler, putting stickers or tags on packages that show price delivery, route, destination, et cetera. I'm not even sure that fits the definition of no pace rate work. It seems to me it is, you know, any employer is going to say, you know, we don't want you to sit around all day long and just kind of do what you feel like doing. Here are the boxes. They need to be marked for price, you know, or here is, you know, the shipments, and you need to get the right routing information on them or what have you. But it's very vague, and I'm troubled by the vagueness precisely for a person like Ms. Szilard. Well, Your Honor, points to the jobs that were identified as example jobs by the vocational expert. And so I'm assuming given, I'm assuming the vocational expert did his work, or her work, whoever it was, and took seriously the limitation to no pace rate work and thought that these jobs were not, for some reason unexplained to me, not pace rate jobs. And I don't see how that can be. If she had wanted a job, you know, as a landscaper, or she had wanted a job as, you know, somebody who sews tote bags, you know, or something, and you can sew so many tote bags in a day, fine. You know, look, maybe she could do that. She apparently was good with her hands. She knitted. She crocheted. But I don't see why these jobs that are identified fit this RFC. Well, Your Honor, as you're describing jobs that are landscaping, crafting, creating things such as a tote bag, and these jobs, labeling, marking, routing things, basically, Your Honor, respectfully, all jobs have a goal, a mission, tasks that someone has to do. And here, Ms. time-sensitive, like you've got to do so many things in a day. You have to prepare so many letters. If you work in the customer complaint center, you have to get through a certain amount of work. And those jobs, which are probably hourly rate jobs, have pace expectations built into them, whereas these other jobs that we're talking about, whether it's landscaping or whether it's could conceivably be done on a piecework basis. So the employer isn't paying for anything that didn't happen. Right. And here, the vocational experts' jobs, there's no indication that those three sample jobs are ones that are bound by the hourly pace, that there have to be a certain amount of things. That seems very unlikely to me. You think an employer would be indifferent about how many packages were that the price sticker was put on? Not at all, Your Honor. I can't believe that. Not at all, Your Honor. But most employers are not indifferent to any kind of work that's tasked to an employee to get done. But they're going to be more indifferent if they don't have to pay for work that isn't done. Right? Correct, Your Honor. So, you know, if you're doing even, let's say, a remote work and you get paid by, you know, how many pages you did on a word processor, okay, fine. Somebody can count how many pages and pay you by the page. But I'm having trouble. Unless you can tell me, is pace rate work something common in the industry? I couldn't find it, actually, anywhere. The petitioner's counsel asked if the number of jobs would shrink if the worker's time was limited to only occasional interaction with coworkers. That kind of hits that pace thing, and he said no. That's right, Your Honor. And that's actually a good point that the only question Ms. Selar, who was represented by another attorney at the administrative level, he had one question only for the vocational expert. The question wasn't about production rate. It wasn't about pace. It was actually about the occasional interaction with others, coworkers and supervisors, and that was the one and only question. The ALJ most certainly gave Ms. Selar's attorney every opportunity to ask those questions. That was the only question that was asked. And turning to the burden of proof in all disability cases, and certainly for Ms. Selar, which is that she has to furnish the evidence to show that she is totally disabled. And in this case, we're really focused on the burden. But the burden is on the commissioner at Step 5 to show that there are jobs in the economy. Correct. And we're in a Step 5 case. And there's no indication that the vocational expert didn't understand something about the ALJ's hypothetical question. Well, because he didn't ask. So Dr. Sedgick says workplace probably has to be slowed down to allow her to function adequately. And he also says something along the lines of she could attend adequately to the task if the information is presented and not bound by time. I don't even know what that means, given that a certain productivity level is rightly expected by employers. Well, Your Honor, the ALJ, it's hard for me standing here, or any of us, to know exactly what was in the mind of Dr. Sedgick, the examiner, or the ALJ, and to parse out these definitions of all sorts of words like pace and production. But it's important for us to evaluate whether this is a rational conclusion, this woman can work at these particular jobs. Right. And the ALJ's RFC finding with these mental limitations really is a direct link to these last two pages of Dr. Sedgick's opinion, found on pages 508 and 509 of the record. And that's where Your Honor just read from, which is that her work pace probably is going to be slowed down, but she can adequately attend to tasks if she's presented with information and not bound by time. The ALJ took that. In your view, how liberated from time is she? Do we know? Your Honor, she hasn't presented any evidence other than this examination that she has other problems with time. But I mean, I guess I'm saying, how long is it going to take her to do these things? Is it going to take her an hour to price a box that it would take somebody else 15 minutes to do? Or is it going to take her? Again, the burden is on the commissioner. It's step five. Right. And the commissioner has presented jobs that, based on the evidence she provided, this is the RFC, and there's really no additional evidence. Is there testimony about the time it takes to do these jobs? And as Your Honor points out, she testified about the things that she could do. She filed taxes using TurboTax. But she could take her time. For all you know, it took her all day to fill out the TurboTax. Right. And, Your Honor, I'm not aware. I'm not aware of the outer limits of how long it would take her. At the same time, there's really no indication that she's so substantially burdened by her kind of mental symptoms that things would necessarily have to take all day. I'm just worried about the absence of evidence for these three jobs that the vocational expert identified. It's like the last thought isn't there on the record. And the job of price marker or end the job of router by this, by a person with these hypothetical restrictions, would only be slowed down by 10% and employers could deal with that. You know, things that are not in the record. But if they were in the record, I would have a much greater confidence level in what's going on. And, Your Honor, this is a suggestion. I believe Ms. Selar's appeal is that these words of production pace are on their face, impermissible, and they must go back. Well, they're just ambiguous. And somebody could say, this is what I mean by it. And it's because sometimes you'll say, well, suppose somebody is going to be off task 10% of the time. And vocational experts routinely will say, well, that's okay. But if it's 15% of the time, then employers are going to say no. So they make these global assessments regularly, and it just wasn't made for this topic. But similar to those percentages, which, again, as Your Honor points out, vocational experts take from hypothetical questions and apply to their expertise in placing people in jobs and knowing within a job the various kinds of ways to perform that job. How detailed are the job codes? They were cited, for example, those positions, job codes 2209.587 through 034. Right. That's the one for the price marker, Your Honor, and I have that in front of me. And in the Dictionary of Occupational Titles, it goes through all of the kinds of requirements, both physical, exertional, as well as non-exertional. Would that answer the question? For that job, the aptitude and things are in the lowest one-third and looking at that DOT number in particular. And I would like to point out, if I may, I realize my time is up, that Ms. Selar and her appeal doesn't get into these DOT numbers, although I have them in front of me, and I'm happy to answer any questions about, in particular, this example. But this really goes back to her problem with the ALJ's translation of Dr. Shedgick's opinion into the RFC, which is exactly the RFC that was given to a vocational expert. And this court, as we pointed out on page 16 of our brief, has upheld, in at least three instances, RFCs that include this language of no high production, no production rate, production goals. So it's not that these words are without any examples in the kind of cases that ALJs present. Thank you, Your Honor. All right. Thank you very much. Mr. Duncan. Thank you. Again, in answer to your question, the DOT describes generally what the job entails. The specifics, there's a GED, which is the General Education Development, indicates what kinds of things are involved, how much reasoning, language, math. But then you have to use the companion publication, the Selective Characteristics of Occupations, which goes into much greater detail of what the jobs entail. And then there is decision from this court that the ONET could also be used, which is the more modern version, that will go into even greater detail on what these jobs require. The problem with this is that we, again, have a problem in that the judge never really explained what this language meant. I did do some further evaluating and research, and I found only one case that addressed the specific language, an unpublished decision of the Sixth Circuit, who reversed because there was no definition provided. If the court would like me to supplement the record with that citation, I can, but that's it. And in this particular case, we have a claimant who testified that she, because of my learning problems, I have problems understanding things or getting things done in a timely manner that jobs require. That's on Record 162. You haven't mentioned much, but supposedly, I don't know what that number 72 means as far as mental capacity. The mental capacity, it's the equivalent of the old IQ test. Okay, but she seems to be able to work around that, I guess. Correct. The problem comes in, Judge, in that what tends to happen is people with lower functioning, processing speed, et cetera, tend to do more manual-type jobs, which they're capable of doing. In her case, she did work salvaging wood from barns, okay? But then she hurt her back, and now she's limited to light work. And once you get into light and sedentary work, then you have a problem in that there are certain requirements for more desk-type work that do not exist for the heavier-type work. And that's where it rests. Thank you. Thank you very much. Thanks to both counsel who take the case under advisement.